# Supreme Court of Texas

No. 22-0662

The City of Austin,

*Petitioner*,

v.

Noel Powell,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

**Argued September 10, 2024**

JUSTICE YOUNG delivered the opinion of the Court.

A fugitive led police officers on a high-speed chase through the streets of Austin. While in pursuit, an officer lost control of his vehicle and collided with a minivan stopped at an intersection. The collision injured Noel Powell, the minivan's driver. Powell, who was not at fault, sued the City of Austin to recover damages for his injuries.

We must decide whether his claim may proceed. The legislature has waived governmental immunity to suit for many torts, but it carved out an

exception when a governmental employee, like the officer who collided with Powell, is "responding to an emergency call or reacting to an emergency situation." Tex. Civ. Prac. & Rem. Code § 101.055(2). This emergency exception applies so long as the officer's "action [was] in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action [was] not taken with conscious indifference or reckless disregard for the safety of others." *Id.*

We hold that the officer's conduct was not in violation of "a law or ordinance" that governed emergency action and that Powell has raised no fact question about whether the officer's conduct was reckless. The Tort Claims Act, therefore, does not waive the City's immunity. We reverse the court of appeals' judgment and render judgment dismissing the case for lack of jurisdiction.

**I**

Officer Brandon Bender was responding to a check-welfare call when he heard "six or seven" gunshots ring out in the neighborhood. Four additional shots followed within about fifteen minutes, and they "sounded even closer than the first shots." Three minutes after that, Officer Michael Bullock spotted a Toyota FJ Cruiser coming from the same direction as the gunshots. Officer Bullock told the vehicle's driver to stop. Instead of stopping, the car "took off." Officer Bender received authorization to pursue the FJ Cruiser with his lights and siren on. Officer Bullock also received authorization to participate in the chase and was assigned to back up other officers.

During the chase, Officer Bender decided to make a right turn onto Brandt Road to "get in front of the pursuit . . . or to close the distance

2

to enter the pursuit." Officer Bullock was following Officer Bender. As Officer Bender slowed to make the turn, Officer Bullock hit the brakes. Unable to slow down in time, Officer Bullock struck the passenger side of Officer Bender's car, causing the two cars to be "semi-stuck together."

Both officers lost control of their vehicles. Officer Bender's vehicle slid through the intersection, running over a stop sign and coming to rest against a fence post. Officer Bullock's vehicle collided with Powell's minivan, which was stopped at the intersection. The impact caused Powell's vehicle to spin 180 degrees before coming to rest, while Officer Bullock's car came to rest against a tree. The post-crash report opined that Officer Bullock's inattention and failure to control his speed contributed to the accident.

Powell sued the City, seeking recovery for his damages. The City filed a plea to the jurisdiction based on the Tort Claims Act's emergency exception and Officer Bullock's official immunity. The trial court denied the City's plea without explanation. The City appealed, raising only the emergency exception. The court of appeals affirmed. 684 S.W.3d 455 (Tex. App.—Austin 2022). It held that there was a fact issue about whether Officer Bullock's actions were reckless, requiring further proceedings in the trial court. *Id.* at 465.

We granted the City's petition for review.

## II

More than twenty years ago, we described the process for resolving a plea to the jurisdiction asserting immunity from suit as one that "generally mirrors that of a summary judgment." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). We reaffirm this

3

description but acknowledge that dispositive-pleading practice has evolved in the interim. The conceptual similarity largely reflects that the parties' burdens will depend on the nature of the plaintiff's claim and how the government poses its jurisdictional challenge. Just as the Texas rules now include not only traditional summary judgment but also no-evidence summary judgment and dismissal under Rule 91a, for example, pleas to the jurisdiction may involve competing evidence, the denial of any probative evidence, or the assertion that the law compels a result regardless of the evidence.

The foundational rule in all cases is that "[a] party suing the governmental unit bears the burden of affirmatively showing waiver of immunity." *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528 (Tex. 2022) (citing *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 512 (Tex. 2019)). There is "a presumption against any waiver until the plaintiff establishes otherwise." *Rattray v. City of Brownsville*, 662 S.W.3d 860, 866 (Tex. 2023). The plaintiff—the nonmovant— survives the plea to the jurisdiction only by showing that the statute "clearly and affirmatively waive[s] immunity" and by also "negating any provisions that create exceptions to, and thus withdraw, that waiver." *Id.* at 867. Though a plaintiff need not anticipate and defeat every defense the government could conceivably raise, *see, e.g.*, *id.* at 867–68, a plea to the jurisdiction may obviously rely on the plaintiff's own pleadings in arguing that they fail to "affirmatively demonstrate the court's jurisdiction to hear the case." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). Where those pleadings indicate, for example, that the emergency exception applies, the government need not

4

produce *additional* affirmative evidence to invoke the exception.

Whether the plaintiff bears an *evidentiary* burden depends on how the government responds to the purported waiver. In *Miranda*, we divided pleas to the jurisdiction into two broad categories. *First*, the government may "challenge[] the pleadings." *Miranda*, 133 S.W.3d at 226. In such a plea, the government does not dispute the plaintiff's factual allegations, and evidence is irrelevant. The question is whether the alleged facts "affirmatively demonstrate a trial court's subject matter jurisdiction." *Id.* That is "a question of law reviewed *de novo*." *Id.* If the plaintiff's allegations neither establish jurisdiction nor negate it, the plaintiff is given an opportunity to amend its pleadings, but if the allegations negate jurisdiction, the plaintiff as a matter of law cannot establish jurisdiction, so the court must grant the plea. *Id.* at 226–27. This type of plea is thus similar—though not identical—to a motion to dismiss under Rule 91a in that it asserts that the plaintiff's allegations, taken as true, do not show a waiver of immunity. *See* Tex. R. Civ. P. 91a.1. In that event, the plaintiff needs to respond not with evidence but with legal argument showing the court that, as a matter of law, its allegations demonstrate an immunity waiver despite the government's contrary arguments.

*Second*, the government's plea to the jurisdiction may instead "challenge[] the existence of jurisdictional facts," requiring the trial court to "consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Miranda*, 133 S.W.3d at 227. The plea to the jurisdiction may, for example, be like a no-evidence motion for summary judgment by asserting that the plaintiff has produced no

evidence of an element required for the immunity waiver to apply. *See* Tex. R. Civ. P. 166a(i). In that event, the plaintiff may respond with additional evidence establishing that element of the waiver. The plea may mirror a traditional motion for summary judgment by attaching evidence in an effort to conclusively negate jurisdiction. *See id.* R. 166a(c). In such a case, the plaintiff must produce enough evidence to raise a genuine issue of material fact to survive the plea. *Miranda*, 133 S.W.3d at 227–28. Or the plea may be like a hybrid motion for summary judgment where both parties attach evidence. The "ultimate issue" in that instance is likewise "whether the nonmovant raised a fact issue to preclude summary judgment." *Fossil Grp., Inc. v. Harris*, 691 S.W.3d 874, 882 (Tex. 2024).

Thus, when we stated in *Mission Consolidated Independent School District v. Garcia* that "[i]nitially, the defendant carries the burden to meet the summary judgment proof standard for its assertion that the trial court lacks jurisdiction," 372 S.W.3d at 635, we were referring to cases in which the plea to the jurisdiction mirrors a traditional or hybrid motion for summary judgment. After all, if the government wants to truly negate the plaintiff's evidence, then it must present evidence of its own. *See id.* at 637 ("While a plaintiff must plead the elements of her statutory cause of action . . . *she will only be required to submit evidence if the defendant presents evidence negating one of those basic facts*." (emphasis added)). We did not, of course, contradict the bedrock principle that the plaintiff bears the burden to establish a waiver of immunity. When there is a dispute over jurisdictional facts, the plaintiff must raise a genuine issue of material fact as to the immunity waiver's applicability. *See Miranda*,

6

133 S.W.3d at 227; *see also Tex. Health & Hum. Servs. Comm'n v. Pope*, 674 S.W.3d 273, 281 (Tex. 2023). When that happens, "we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Maspero*, 640 S.W.3d at 528–29. If the evidence raises a fact question as to the court's jurisdiction, then the trial court may not grant the plea. *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 116 (Tex. 2010). But the court must grant the plea if the evidence fails to raise a question as to the existence of a jurisdictional fact. *Maspero*, 640 S.W.3d at 529.

A party's characterization of its pleadings does not control how the courts review them. Whatever the government may call its jurisdictional challenge—a plea to the jurisdiction, a motion to dismiss, or a motion for summary judgment—we look to its substance. *See, e.g.*, *Oscar Renda Contracting, Inc. v. Bruce*, 689 S.W.3d 305, 311 (Tex. 2024) (noting that "our Court has consistently held that we examine the substance of a motion or pleading rather than requiring the formality of a title"); *Thomas v. Long*, 207 S.W.3d 334, 339 (Tex. 2006) (treating a summary-judgment motion as a plea to the jurisdiction for purposes of appellate jurisdiction).

Here, the City's plea to the jurisdiction most closely mirrors a no-evidence motion for summary judgment. It argues that Powell failed to establish jurisdictional facts after adequate time for discovery. We therefore review Powell's allegations and evidence (considering the City's undisputed evidence only for context), and we determine whether Powell has raised a fact issue regarding the Tort Claims Act's immunity waiver.

# III

## A

As a political subdivision of the state, the City is "immune from suit unless [its] immunity is waived by state law." *Maspero*, 640 S.W.3d at 528. The Tort Claims Act waives immunity for certain torts, but it "withdraws" the waiver in various circumstances. *Rattray*, 662 S.W.3d at 866. As relevant here, if an injury arises from an officer's response to an emergency call or reaction to an emergency situation, the Act withdraws the waiver of immunity *unless* (1) the officer did not comply with "the laws and ordinances applicable to emergency action," or (2) in the absence of such laws, the officer acted "with conscious indifference or reckless disregard for the safety of others." Tex. Civ. Prac. & Rem. Code § 101.055(2); *see Maspero*, 640 S.W.3d at 529. The court of appeals held that Officer Bullock was responding to an emergency situation. 684 S.W.3d at 462. The parties do not dispute this holding, and it is one with which we agree.

This case therefore turns on the applicability of the emergency exception. The issue reduces to whether Officer Bullock (1) "compli[ed] with the laws and ordinances applicable to emergency action," or (2) "in the absence of such a law or ordinance," acted "with conscious indifference or reckless disregard for the safety of others." Tex. Civ. Prac. & Rem. Code § 101.055(2). No party before us argues that this latter inquiry is distinct from showing recklessness, and our cases generally have proceeded by regarding recklessness as what the latter inquiry requires. *See, e.g.*, *Maspero*, 640 S.W.3d at 529; *City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1998). We therefore again assume for purposes of

8

this case that there is no difference between "conscious indifference or reckless disregard" and "recklessness."

The court of appeals, in reliance on *Maspero*, held that *both* components of the emergency exception's jurisdictional inquiry—the law-or-ordinance prong *and* the recklessness prong—"'collapse[]' into one inquiry concerning [Officer Bullock's] recklessness." 684 S.W.3d at 463 n.3 (quoting *Maspero*, 640 S.W.3d at 529). *Maspero* did not hold that the two distinct inquiries are in fact only one. It said that "the distinction between these inquiries largely collapses *in this case.*" *Maspero*, 640 S.W.3d at 529 (emphasis added). Such a result may often occur, as in *Maspero*, and will depend on the content of an applicable statute or ordinance.

The plain language of the emergency exception, however, contemplates two distinct inquiries to be undertaken in a particular order. First, the court must assess whether any laws or ordinances apply to the emergency action at issue in the case. Such a law or ordinance may apply to some aspect of the emergency action (hypothetically, for example, by controlling maximum speed) or to the entire action. If there is an applicable law or ordinance that governs the emergency action or governs the only parts of that action that allegedly justify the imposition of liability, the jurisdictional inquiry turns on whether the officer's action complied with the relevant law or ordinance. *See Martin*, 971 S.W.2d at 428 ("Because [a statute] controls Clark's action as an emergency vehicle operator in an emergency situation, we look to see if Clark complied with that [statute]."). The second inquiry is triggered only if no law or ordinance governs the emergency action at issue or any part of it. The

jurisdictional inquiry would then become whether there is a fact issue as to that officer's recklessness in undertaking the action that led to the injury; any conduct that complied with an applicable law or ordinance would not be subject to that analysis.

It was not always this way. The first version of the Tort Claims Act, enacted in 1969, contained an emergency exception that was nearly identical in wording to today's version except that it lacked the recklessness prong. *See* Texas Tort Claims Act, 61st Leg., R.S., ch. 292, § 14(8), 1969 Tex. Gen. Laws 874, 878 (codified at Tex. Civ. Prac. & Rem. Code § 101.055(2) by Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3304). Thus, under the old version, the waiver of immunity did not apply if the officer acted "in compliance with the laws and ordinances applicable to emergency action." *Id.* In *Black v. Nueces County Rural Fire Prevention District No. 2*, we read that language to require a specific "law[] or ordinance[] pertaining to *this* emergency situation." 695 S.W.2d 562, 563 (Tex. 1985) (emphasis added).

In *Black*, a volunteer firefighter sued the department after he was struck by an engine reversing from the scene of a fire. *Id.* Because neither the plaintiff nor the government defendant pointed to any law or ordinance applicable to that particular action, we held that the exception did not apply, and immunity was therefore waived. *Id.* Importantly, *Black* treated the "laws and ordinances" prong of that version of the emergency exception as a potential shield for the government. That is, if the officer's allegedly tortious action was undertaken in compliance with an applicable law or ordinance, then his employer would enjoy governmental immunity. With this defensive view in mind, it made sense

10

for the set of laws applicable to emergency action to be narrow. If the general rules of the road were the laws and ordinances applicable to emergency action, then the government could always show compliance with *some* law, and the emergency exception would swallow the Act's immunity waiver. Instead, the Court understood the statute to address only laws or ordinances that *target* emergency action.

But as *Black* construed it, the emergency exception generated less protection for emergency responders than the legislature may have anticipated. In the legislative session following our decision in *Black*, the legislature added the recklessness prong to the emergency exception. When no specific law or ordinance applied, therefore, the emergency exception could still cover the government defendant if its actions were not "taken with conscious indifference or reckless disregard for the safety of others." Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 3.05, 1987 Tex. Gen. Laws 37, 49 (amending Tex. Civ. Prac. & Rem. Code § 101.055(2)). Notably, the legislature left the first part of the emergency exception intact. Accordingly, *Black*'s holding that laws and ordinances must specifically address emergency action to qualify as "applicable to emergency action" remains good law. The legislature supplemented that provision by adding the recklessness prong, which provides additional protection for government defendants.

Thus, where a case arises from "emergency calls or [a] react[ion] to emergency situations," official "compliance with [] laws and ordinances" will be relevant only if the law or ordinance expressly "pertain[s] to th[e] emergency situation." *Black*, 695 S.W.2d at 563. Both parties may find it useful to identify such a provision. If the plaintiff can point to a law or

11

ordinance that directly and specifically governs emergency responses and can show that the government defendant did not comply, then immunity is waived. On the other hand, if the government defendant can point to an applicable law or ordinance, and can establish compliance, then at least that aspect of the claim is off the table. Imagine, for example, a hypothetical statute providing a safe harbor such that it is always acceptable to exceed the posted speed limit by twenty miles per hour during an authorized police pursuit. Under such a regime, *speed* would often be unavailable to a plaintiff seeking to negate the emergency exception, and if elevated speed was the only basis for the claim, then the plea would be granted without proceeding to the recklessness prong.

Where *neither* party can point to such a law, however, the first prong of § 101.055(2) is irrelevant to dislodging governmental immunity. After all, an officer cannot comply with (or violate) a law that does not exist. *See id.* The legislature's apparent response to *Black* was to shift the consequence of the absence of a law or ordinance. Under *Black*, such an absence confirmed the waiver of immunity and the case would proceed in the trial court. But after the 1987 amendment, which created the emergency exception essentially in its current form, the case must then proceed through an additional recklessness analysis.

All of this is reflected in the approach we took in *Maspero*. True, in that case we framed the question as whether the plaintiff could prove the "pursuit *violated* the laws and ordinances applicable to emergency response," rather than whether the government could prove *compliance*. *Maspero*, 640 S.W.3d at 529 (emphasis added). But that is really just another way of expressing the same idea: under the first prong of

12

§ 101.055(2), official compliance with a relevant statute may foreclose liability, while a violation (obviously) will not. Compliance and violation are two sides of the same coin. Either way, the *kind* of statute at issue is what matters. *Maspero* and *Black* both rejected the plaintiff's broad reading of "laws and ordinances applicable to emergency action." *Id.* at 529–31; *Black*, 695 S.W.2d at 563.

We reaffirm this sound reasoning today. Where a plaintiff seeks to raise a fact issue as to official compliance with "laws and ordinances applicable to emergency action," but points to no law or ordinance that specifically applies to that action, the first prong of § 101.055(2) has no role to play. By the same token, generally applicable rules of the road that do not specifically address or reference emergencies are not applicable to emergency action for purposes of the emergency exception. After all, if every rule of the road applied to emergency action unless a statute expressly says otherwise, officers would routinely violate § 101.055(2). For instance, it is likely that an officer in a high-speed chase will fail to "signal continuously for not less than the last 100 feet" before turning. Tex. Transp. Code § 545.104(b). And the Court in *Black* could not have concluded that "there were no laws or ordinances pertaining to [the] emergency situation" if nearly *every* traffic law pertained to the emergency. *Black*, 695 S.W.2d at 563. Nor, by common sense, should the emergency exception's shield apply automatically whenever a government employee happens to *comply* with one of the thousands of traffic regulations that govern our state's highways but have nothing particular to do with the special context of emergency responses. Neither extreme result is defensible under, much less required by, the text of § 101.055(2).

13

It is of course true that, under Transportation Code § 542.002, the general rules of the road are "applicable to . . . a vehicle owned or operated by . . . this state[] or a political subdivision of this state." State employees are not, as a class, above the traffic laws, and government-owned vehicles of every variety must coexist with the public on the roads. To say that the rules of the road apply to the class of public servants and vehicles owned by the government, however, is not to say that such rules are automatically "applicable to [the] emergency action[s]" that Texans rely on public servants to perform. Tex. Civ. Prac. & Rem. Code § 101.055(2). Nor does § 542.002's caveat—that it applies "except as specifically provided otherwise . . . for an authorized emergency vehicle"—change the analysis. It confirms it by acknowledging that there *are* provisions of the law that *do* specifically address emergency contexts. Notably, "authorized emergency vehicle" is broadly defined in § 541.201 to include even vehicles owned by *private* entities, such as a blood bank or a private ambulance company. Tex. Transp. Code § 541.201(B), (I).

In short, while statutes that *specifically* govern emergency action are relevant where a plaintiff attacks governmental immunity in the emergency context, generally applicable traffic rules are not.

**B**

Accordingly, we must first resolve whether Officer Bullock's actions were governed by any applicable law or ordinance. If so, the jurisdictional question is only whether there is a fact issue as to his compliance with those laws.

14

**1**

Powell first argues that Officer Bullock did not comply with laws governing emergency responses because he violated § 545.062(a) of the Transportation Code. That statute requires an operator of a motor vehicle following another motor vehicle to "maintain an assured clear distance between the two vehicles so that . . . the operator can safely stop without colliding with the preceding vehicle or veering into another vehicle, object, or person on or near the highway." *Id.* § 545.062(a). Officer Bullock admitted that he was following so closely behind Officer Bender's car that he "was unable to slow in time" to avoid colliding with it. We agree that such behavior would likely constitute a violation of § 545.062(a)—in other words, non-officers could not drive so closely without violating the statute, and if the statute applies to police in emergency situations, then there would at the least be a fact question.

The key legal question, then, is whether § 545.062(a) is a law or ordinance *applicable to emergency action* for purposes of § 101.055(2). We conclude that it is not. Section 545.062(a) does not purport to regulate emergency personnel; it is a statute of *general* applicability. Following *Black* and the legislature's reenactment of § 101.055(2)'s first prong, we expect something more to indicate that a law "pertain[s] to this emergency situation." *Black*, 695 S.W.2d at 563. Chapter 546, by contrast, fits the bill: it is a *specific* body of rules and regulations that govern the operation of emergency vehicles. It lists a few specific actions that, outside the emergency context, would violate the laws governing drivers, but that are permissible for officers responding to emergencies. *See* Tex. Transp. Code § 546.001. For example, an officer may "proceed

15

past a red or stop signal or stop sign, after slowing as necessary for safe operation." *Id.* § 546.001(2). Chapter 546 then sets a baseline standard for *all* emergency responses: emergency responders retain "the duty to operate the vehicle with appropriate regard for the safety of all persons" and must bear "the consequences of reckless disregard for the safety of others." *Id.* § 546.005.

Laws that specifically regulate emergency responses further indicate that generally applicable traffic laws are inapplicable to emergency responses. Our precedent, the statutory text, and longstanding principles of statutory interpretation make this plain. The Transportation Code provides that the generally applicable rules-of-the-road provisions (such as Chapter 545) apply "to the operator of a vehicle owned or operated by . . . a political subdivision of this state, except as specifically provided otherwise by this subtitle for an authorized emergency vehicle." *Id.* § 542.002. Put another way, "where in one section a general rule is prescribed, which without qualification would embrace an entire class of subjects, and in another section a different rule is prescribed for individual subjects of the same class, the latter must be construed as exceptions to the general rule, and be governed by the section which is applicable to them alone." *Lufkin v. City of Galveston*, 63 Tex. 437, 439 (1885); *see also Perez v. Perez*, 59 Tex. 322, 324 (1883) (noting that "when the law makes a general provision, apparently for all cases, and a special provision for a particular class, the general must yield to the special clause, so far as the particular class is concerned"). General rules for safe driving do not constitute specific rules to govern emergencies.

Chapter 545, moreover, confirms this reading because it contains two provisions that *expressly* apply to emergency-response situations. *See* Tex. Transp. Code §§ 545.365(a)(1) (authorizing emergency vehicles to exceed the speed limit when responding to emergency calls), 545.204(b) (noting that emergency-vehicle operators are not exempt "from the duty to drive with due regard for the safety of all persons"). These are exceptions that prove the rule: unless otherwise specified, Chapter 545's provisions do *not* regulate emergency responses. *See Dolan v. Walker*, 49 S.W.2d 695, 697 (Tex. 1932) (explaining that "when there are words in a statute expressive of a particular intent, and other words indicating a general intent inconsistent therewith, the particular intent must be taken as an exception to the general rule").

We thus conclude that § 545.062(a) is a law of general applicability that is not specifically "applicable to emergency action" under § 101.055(2) of the Tort Claims Act.

**2**

Powell next argues that Officer Bullock violated Chapter 546 of the Transportation Code because his actions did not fall within § 546.001's four expressly authorized responses to emergency situations. As noted above, at least some of § 546.001's provisions are specifically applicable to emergency situations: § 546.002(b)(1) specifies that subsections (2), (3), and (4) of § 546.001 apply when "responding to an emergency call." Tex. Transp. Code § 546.002(b)(1). Each of § 546.001's relevant provisions, however, is phrased in the affirmative. They do not forbid any official action but instead permit the enumerated actions under certain conditions. Powell's argument thus relies on the *expressio unius* canon of

17

statutory interpretation: "expressing one item of a commonly associated group or series excludes another left unmentioned." *United States v. Vonn*, 535 U.S. 55, 65 (2002). Because the legislature expressly identified four departures from the ordinary rules, the argument goes, it must have intended to make all the rest of the ordinary rules binding even in emergency contexts.

We reject this argument. The *expressio unius* canon does not apply unless the statutory context makes it "fair to suppose that the legislature considered the unnamed possibility and meant to say no to it." *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 429 (Tex. 2017) (brackets omitted) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013)). Nothing suggests that this condition is satisfied here.

For one thing, as we noted above, Chapter 545 refers several times to emergency conduct, which would be pointless if the standards for emergency driving and for ordinary driving were the same except for the four situations enumerated in § 546.001. Indeed, the express references to emergency contexts in some Chapter 545 provisions could present a competing *expressio unius* argument—one that is consistent with our decision in *Black*, which indicated that the laws and ordinances "applicable to emergency action" are those that specifically say so. 695 S.W.2d at 563.

This larger context is consistent with the very nature of emergency action, which calls for split-second, fact-specific decisions in unpredictable situations. The legislature's attention to emergency contexts without greater specificity reflects a recognition that it cannot—and, perhaps more to the point, that the police cannot—predict and plan in advance for

18

every possible emergency. Likewise fruitless would be any attempt to delineate every way an officer might permissibly react in an emergency situation. The statute as a whole therefore confirms § 546.001's role as identifying some particularly important and common examples of permissible emergency-response actions, which does not convey that those examples constitute an exclusive list. To the contrary, it is reasonable to read the enumerated authorizations in § 546.001 as constituting safe harbors. They remove any doubt that undertaking those actions is categorically permissible, which makes it especially hard to pin liability on an officer who undertakes them. What is more, where an officer *does* undertake one of the enumerated actions, the legislature has provided standards with which a court can judge the officer's "compliance" with § 546.001. For example, an officer who accepts the authority to "proceed past a red or stop signal" also accepts the responsibility to "slow[] as necessary for safe operation." Tex. Transp. Code § 546.001(2).

We reject Powell's construction for a third reason, as well: it would require us, by invocation of a canon of construction that does not readily fit here, to ascribe to the legislature the intent to hamstring officers in the performance of especially dangerous duties. If Powell's construction were correct, officers would be severely limited in their ability to respond to emergencies—they would have discretion to disregard only four rules of the road. As we have acknowledged, the legislature has determined "that the public good will be better served by encouraging public employees to take immediate action in emergency situations." *City of San Antonio v. Hartman*, 201 S.W.3d 667, 673 (Tex. 2006).

The facts here illustrate the point. If § 546.001 plays the role that

19

Powell alleges, officers could never closely follow behind another vehicle during a police chase.  But officers often must do so.  The Austin Police Department policy manual, for example, authorizes officers to perform Precision Immobilization Technique maneuvers.  The whole point of a PIT maneuver is for an officer to closely follow a fleeing vehicle—and then to make contact with the rear quarter panel of that vehicle, causing it to spin out.  Other officers then surround the suspect's vehicle, preventing the car from driving away.  The policy manual refers to this (and other similar measures) as a "tactical vehicle containment procedure."  *Other* officers must then physically restrain the suspect, preventing him from fleeing on foot.  For these reasons, it generally takes at least three police officers to perform a successful PIT maneuver.  This is likely one reason why the APD manual requires at least three police units to be involved in a car chase before attempting such a maneuver.  The maneuver *requires* closely following a suspect, who is far less likely than a fellow police officer to act predictably.

Beyond pursuing a suspect at close range, officers must sometimes closely follow each other.  If the other officers are far behind the action, risking increased separation and the insertion of the general public within an action, they cannot successfully surround the suspect's vehicle once the lead officer begins the maneuver.  Detaining the suspect would take longer and become riskier.  Such a result would expose not just the officers but other members of our society to a fugitive who has demonstrated a willingness to do whatever it takes to avoid capture.  In such emergency scenarios, time is of the essence and inches matter.  But under Powell's theory, officers could never undertake maneuvers like

20

these—or anything else that is forbidden to ordinary motorists and not exempted by § 546.001. If the statute commanded such a result, we would have no choice but to follow it. But the text of the statute does not compel or justify Powell's reading, and for the reasons we have articulated, it is easy to see why the statute instead bears the meaning that we have ascribed to it.

**3**

We next address the invocation of § 546.005's refusal to "relieve" an officer either of "the duty to operate the vehicle with appropriate regard for the safety of all persons" or of "the consequences of reckless disregard for the safety of others." Tex. Transp. Code § 546.005. This provision largely corresponds to the second prong in the Tort Claims Act's emergency exception. *See* Tex. Civ. Prac. & Rem. Code § 101.055(2) (providing that the emergency exception does not apply if the officer acted "with conscious indifference or reckless disregard for the safety of others"). We thus explained in *Maspero* that the statutory "structure and language" often collapse into an inquiry into whether the officer acted recklessly. 640 S.W.3d at 529. Put another way, whether the emergency exception's applicability turns on § 546.005 of the Transportation Code (a law applicable to emergency responses) rather than some other emergency-specific law, or § 101.055(2) of the Tort Claims Act (which imposes a recklessness standard in the *absence* of laws applicable to emergency responses), the inquiry will *often* reduce to whether the officer acted recklessly.

As we have explained, however, that does not mean that the inquiry will *always* be one into the officer's recklessness. Beyond

21

§ 545.062(a) and Chapter 546, the parties do not identify any other statutes (or ordinances) that expressly regulate emergency action. We thus confine our analysis in this opinion to the provisions the parties have raised. Advocates, however, should present to the courts *all* statutes that may be "laws and ordinances applicable to emergency action" for purposes of § 101.055(2), looking in every instance for an express and specific indication that the statute is so applicable.

## 4

Finally, Powell argues that Officer Bullock did not comply with laws and ordinances applicable to emergency action because he violated Austin Police Department policy by (1) not using his best judgment in starting the chase, (2) not terminating the chase when the suspect vehicle's whereabouts were unknown, and (3) following Officer Bender's car too closely.

Solely for argument's sake, we will assume that these assertions reflect violations of departmental policy. But even indulging that assumption, § 101.055(2) expressly conditions its reach on compliance with "laws and ordinances"—not internal police-department policies. *See Maspero*, 640 S.W.3d at 530. We certainly do not contend that violations of departmental policy are of no consequence—but the consequences, whether from internal discipline or otherwise, are immaterial to the legal question before us.

\*   \*   \*

In short, § 545.062(a) is not a law or ordinance applicable to emergency action for purposes of the Tort Claims Act. Officer Bullock did not violate Chapter 546 simply by doing something that was not expressly

22

enumerated in § 546.001. And even assuming a violation of the police department's policy manual, such a violation would not inherently violate any laws or ordinances under § 101.055(2).

## C

Because no other law or ordinance governed his emergency actions, the jurisdictional question instead becomes whether there is a fact issue as to Officer Bullock's recklessness. The Transportation Code defines "reckless driving" as driving "a vehicle in wilful or wanton disregard for the safety of persons or property." Tex. Transp. Code § 545.401(a). Chapter 546 adopts a comparable tone. It requires officers "to operate the vehicle with appropriate regard for the safety of all persons," *id.* § 546.005(1), and refuses to excuse officers for "the consequences of reckless disregard for the safety of others," *id*. § 546.005(2). The Tort Claims Act imposes a similar duty. The emergency exception does not apply if the officer acts "with conscious indifference or reckless disregard for the safety of others." Tex. Civ. Prac. & Rem. Code § 101.055(2).

As we have noted, no party has contended that there is any distinction between this standard and simple "recklessness," and we have previously assumed as much. *See supra* Part III.A. We accordingly assume as much again, reserving for a future case, if one ever comes, the possibility that the statutory standard is more nuanced. For present purposes, it is enough to apply our precedents concerning recklessness.

To do so in *Maspero*, we asked whether the officer "knew or should have known" that her act posed an unacceptable risk of injury, separating out subjective actual knowledge from imputed knowledge. 640 S.W.3d at 531. We also highlighted the officer's use of her lights and siren and

23

communication with a commanding officer as evidence that she "engaged in some degree of risk assessment" and "intend[ed] to minimize potential harm." *Id.* at 532. Likewise, in *City of San Antonio v. Hartman*, we said that conscious indifference or reckless disregard "require[s] proof that a party *knew* the relevant facts but did not care about the result." 201 S.W.3d at 672 n.19 (emphasis added). Our case law thus seems to read § 101.055(2) as bifurcated between the officer-specific subjective awareness (what the officer knew) and the hypothetical objective (what the officer should have known). It seems unlikely that this distinction would often or perhaps ever make a difference; only a rare defendant would testify that he was consciously indifferent to a risk of harm. In nearly every case, the officer's state of mind will be inferred from the circumstances of his actions. The question seems to reduce to asking whether, under the circumstances, the officer's action was reckless. Answering that question may mean asking whether a given officer "engaged in some degree of risk assessment," as well as whether his actions simply "generated [an] 'extreme risk' beyond that which is inherent in high-speed pursuits." *Maspero*, 640 S.W.3d at 532 (quoting *Tarrant County v. Bonner*, 574 S.W.3d 893, 902 (Tex. 2019)).

Today we also decide *City of Houston v. Rodriguez*, another challenge to police action, on official-immunity grounds. ___ S.W.3d ___, ___ (Tex. Dec. 31, 2024) (No. 23-0094). This Court has seemingly never noted any links between the Tort Claims Act's recklessness prong and our "good faith" inquiry in the official-immunity context. The affirmative defense of official immunity "inures to all governmental employees who perform discretionary functions in good faith and within their authority."

24

*City of San Antonio v. Riojas*, 640 S.W.3d 534, 538 (Tex. 2022) (quoting *DeWitt v. Harris County*, 904 S.W.2d 650, 652 (Tex. 1995)).  To claim official immunity, an officer's actions "must be justified with reference to what a reasonably prudent officer, possessed of the same information and under the same or similar circumstances, could have believed."  *City of Houston v. Sauls*, 690 S.W.3d 60, 75 (Tex. 2024).  This language should sound familiar: *Maspero* also treated official "risk assessment" based on factual circumstances as a key indicator that an officer was not reckless under the Tort Claims Act.  640 S.W.3d at 532.  Because risk assessment must be "based on the officer's perception of the facts at the time of the event," both inquiries necessarily require careful consideration of those facts by a reviewing court.  *Riojas*, 640 S.W.3d at 539 (quoting *Wadewitz v. Montgomery*, 951 S.W.2d 467 (Tex. 1997)).  Put simply, the factual context of the action will be relevant either way.

At the same time, official immunity and the Act's emergency exception remain importantly distinct.  Official immunity is a "common law defense," the purpose of which "is to insulate the functioning of government from the harassment of litigation."  *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994).  But the emergency exception is a creature of statute, an exercise of the legislative prerogative "to determine how and when to allow tax resources to be shifted away from their intended purposes toward defending lawsuits and paying judgments."  *Hughes v. Tom Green County*, 573 S.W.3d 212, 218 (Tex. 2019) (quotation marks omitted).  Additionally, the scope of official immunity, extending to all "discretionary functions . . . within [an officer's] authority," *Riojas*, 640 S.W.3d at 538, exceeds that of the emergency exception, which is

25

expressly limited to "responding to an emergency call or reacting to an emergency situation," Tex. Civ. Prac. & Rem. Code § 101.055(2).

The official-immunity doctrine and the emergency exception accordingly have significant substantive and procedural differences. Both may apply in some cases; neither will apply in others; and in yet others one but not the other will apply. We have no occasion here to decide how these differences in purpose and scope may affect how each of the related inquiries is conducted. Rather, we merely note that deciding whether an officer's action implicates official immunity or the emergency exception will involve reasoned consideration of the action's *context*.

Considering the context of Officer Bullock's actions, it was Powell's burden to raise a fact issue as to Officer Bullock's recklessness as understood in our precedents. The facts advanced, moreover, must show "more than a 'momentary judgment lapse' and instead '[] that the driver committed an act he knew or should have known posed a high degree of risk of serious injury.'" *Maspero*, 640 S.W.3d at 531 (quoting *Perez v. Webb County*, 511 S.W.3d 233, 236 (Tex. App.—San Antonio 2015, pet. denied)).

The court of appeals listed several considerations that, in its view, created a fact issue as to Officer Bullock's recklessness: Officer Bullock's failure to control his speed, his inattentiveness, his failure to maintain a safe following distance, and the seriousness of the accident. 684 S.W.3d at 464–66. It also ignored context suggesting that Officer Bullock was *not* reckless. We address each point in turn and then consider them jointly.

***Failure to control speed.*** Officer Bullock's failure to control his speed does not create a fact issue as to recklessness. Officers are expressly authorized to exceed the speed limit when responding to emergency

26

situations as long as they do not endanger life or property. Tex. Transp. Code § 546.001(3). In part, this is because "[e]xceeding the speed limit is part and parcel of a police chase." *Maspero*, 640 S.W.3d at 532.

Notably, Powell agrees in his brief that "speed is not the issue in this case." And in the very next sentence, he argues that the main issue is Officer Bullock's failure to maintain a safe distance from Officer Bender's car. In other words, Powell does not meaningfully argue that Officer Bullock's failure to control speed was reckless. Instead, he focuses on Officer Bullock's failure to comply with § 545.062(a).

In any event, Officer Bullock's failure to control his speed does not create a fact issue as to recklessness. The accident report notes that Officer Bullock's failure to control his speed was a contributing factor to the accident. True, going more slowly may have prevented the accident, but vague descriptions of a high rate of speed "lack specificity" and by themselves do not "support a finding of reckless disregard." *City of Houston v. Green*, 672 S.W.3d 27, 31 (Tex. 2023). Moreover, even if *some* exceedingly high rate of speed could amount to recklessness, evidence of the actual speeds involved would be necessary to make such a showing. Yet the record is devoid of any such evidence: neither officer's speed before the accident is known. Having failed to put on any evidence of the cruisers' speeds, such as expert reconstruction, GPS data, dashcam footage, bodycam footage, or surveillance footage, Powell cannot rely on the crash report's vague statement that speed contributed to the collision to raise a fact question as to that speed's *recklessness*. *Id*.

We do not hold that excessive speed is categorically a matter of only negligence that never could be relevant to recklessness. Adverse

27

weather conditions, roadworks, or the presence of pedestrians could make some speeds reasonable or negligent in one chase but inordinately risky and reckless in another. As *Maspero* observed, speeding is *ordinarily* "part and parcel of a police chase," 640 S.W.3d at 532, so deeming speed in and of itself to raise a fact question about recklessness in such cases would be exceptional. Absent *any* evidence as to Officer Bullock's speed in the context of this chase, we decline to hold that this is one of the exceptional cases. At most, in the context of a pursuit, there could be a question only of negligence—a momentary lapse in judgment within a chase that inherently would involve high speed. Momentary lapses in judgment are not grounds for finding recklessness. *Id.* at 531; *see also 4Front Engineered Sols., Inc. v. Rosales*, 505 S.W.3d 905, 911 (Tex. 2016) (stating that to establish recklessness, it was "not enough to show that 4Front knew or should have known that Reyes would have a momentary lapse in judgment or otherwise act negligently"). There is simply no evidence in the record that under any test for recklessness the alleged "failure to control speed" would qualify. Nothing, for example, raises a fact question that Officer Bullock *consciously disregarded* others' safety by driving quickly (or even that he was violating the speed limit *at all*).

*Failure to maintain a safe following distance.* Powell asserts that Officer Bullock violated § 545.062(a) of the Transportation Code by failing to maintain a safe following distance from Officer Bender's vehicle. He also asserts that Officer Bullock failed to comply with police-department policy, which requires officers to space themselves from other vehicles so that they can safely react to other vehicles' movements. Officer Bullock's alleged failure to comply with either requirement,

28

Powell argues, creates a fact issue as to his recklessness.

The City argues that this point is simply a restatement of the "failure to control speed" category. We disagree. The two are conceptually distinct; two cars traveling even at low rates of speed can still be too close, such that the second car cannot stop in time to avoid rear-ending the first. Rush-hour traffic jams on urban interstate highways supply ample evidence. More importantly, the Transportation Code itself distinguishes between the two concepts by imposing separate requirements for each. *Compare* Tex. Transp. Code § 545.351 (forbidding operators from driving at a speed "greater than is reasonable and prudent under the circumstances then existing"), *with id.* § 545.062 (requiring operators to maintain a safe following distance between other vehicles "considering the speed of the vehicles, traffic, and the conditions of the highway").

But this point does not affect the outcome here. Either way, Officer Bullock's alleged failure to maintain a safe following distance does not create a fact issue as to his recklessness. Perhaps most important is the absence of evidence that would be essential to Powell's theory—in particular, some evidence of the actual distance between the two cruisers preceding the crash, which is not in the record. Rather than showing Bullock's supposedly reckless proximity to Bender, Powell relies on the very fact that Bullock hit Bender to reverse-engineer the conclusion that he must have been following too closely—and doing so recklessly.

This approach gets the matter backwards by supposing the cause based on the result, which is insufficient even to establish negligence: "[N]egligence is never presumed, and [] the mere happening of an accident is no evidence at all of negligence." *Wells v. Tex. Pac. Coal & Oil Co.*, 164

S.W.2d 660, 662 (Tex. 1942). Far less, then, can the "happening of an accident" supply any evidence of *recklessness*. And even assuming that the conduct *was* negligent, "[e]vidence of negligence does not establish recklessness." *4Front Engineered Sols.*, 505 S.W.3d at 911. Said differently, we cannot accept as legally sufficient a rationale that starts with an accident, reasons that the accident's occurrence creates evidence of negligence, and then leaps to the conclusion that evidence of negligence must also entail evidence of recklessness.

Most significant is the leap from negligence to recklessness. Logically, failing to maintain a safe distance generally sounds in negligence. Absent some evidence of the actual proximity, proving that Officer Bullock was following too closely would *at most* show negligence—but standing alone, that is not enough to trigger a fact question about recklessness. *See id.*

Spacing between vehicles obviously helps prevent collisions. Bullock's testimony that he tried but failed to slow in time to avoid hitting Bender allows an inference that, in the heat of the chase, he may not have complied with the general departmental policy that Powell invokes. But none of that provides any evidence that the officer was reckless—wholly indifferent to the risks to others (and to himself). Violating the policy in a chase would require some showing that the distance between the two vehicles was *far less* than even the policy minimum, but no party testified as to the exact (or even approximate) distance between the two vehicles. As Powell's counsel conceded at oral argument, the policy violation alone obviously cannot raise a fact question as to recklessness.

Holding otherwise would belie our law's mandate that officers

"retain discretion" to balance needs and risks when responding to emergency situations. *Maspero*, 640 S.W.3d at 532. As part of this discretion, officers are expressly permitted to violate provisions of the Transportation Code when responding to emergency situations. *See, e.g.*, Tex. Transp. Code § 546.001. Having authorized deviation from traffic laws, the law's command would border on absurdity by then treating *any* deviation from mere department policy as evidence of recklessness. Moreover, as we noted above, perfect compliance with the Transportation Code and departmental policy may be impossible: the Austin Police Department's General Orders themselves, after all, instruct officers on procedures (like the PIT maneuver) that require officers to follow both the suspect *and one another* extremely closely. On Powell's quasi-strict-liability approach to the safe-distance requirement, nearly every step of any such tactic would automatically constitute evidence of reckless disregard. Instead, the law provides that as long as officers do not act recklessly in maintaining close proximity during a chase, they are within the bounds of their discretion and satisfy the duty of care expected of them.

Powell has not directed us to any evidence that Officer Bender "did not care about the result" that could be caused by his following too closely. *Hartman*, 201 S.W.3d at 672 n.19. Nor could he, without making a prerequisite showing of what the following distance was. We thus conclude that Officer Bullock's alleged failure to maintain a safe distance does not create a fact issue as to his recklessness.

***Inattentiveness and the severity of the accident.*** The accident report listed Officer Bullock's inattentiveness as a contributing factor to the crash. *Even if* Officer Bullock was inattentive, however, that evidence

31

by itself would amount only to ordinary negligence. Failure to pay attention is a paradigmatic example of *negligence* and does not by itself constitute *reckless* conduct. As we recently held, "[a]n act or omission that is merely thoughtless, careless, or not inordinately risky" is nothing more than ordinary negligence. *Medina v. Zuniga*, 593 S.W.3d 238, 249 (Tex. 2019) (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994)). Recklessness requires more: in this case, "conscious indifference or reckless disregard for the safety of others." Tex. Civ. Prac. & Rem. Code § 101.055(2). As with Officer Bullock's speeding and proximity to Officer Bender, Powell again does not offer evidence of Bullock's inattention sufficient to create a fact issue as to recklessness. Neither the crash report, nor Officer Bullock's testimony, nor any other evidence indicates how long Bullock was supposedly inattentive or whether the inattentiveness is merely the conclusory summary of the fact that the accident happened. The crash report's bare statement that inattention contributed to the collision "lacks specificity" and does not establish the type of inattention "that, by itself, could support a finding of reckless disregard." *Green*, 672 S.W.3d at 31.

The court of appeals also noted the seriousness of the accident and subsequent injuries when discussing the evidence that Officer Bullock recklessly caused it. 684 S.W.3d at 466. As we have explained, it is error to reason from result to cause in finding negligence. *Wells*, 164 S.W.2d at 662. Perhaps unsurprisingly, we appear never to have clarified that the same rule applies for the *higher* showing of recklessness, but that result is logically inescapable. We agree with the observation made by the Fifth Court of Appeals that "[m]ere involvement in a collision does not create

32

an inference or conclusion that a driver is incompetent or reckless." *Monroe v. Grider*, 884 S.W.2d 811, 818 (Tex. App.—Dallas 1994, writ denied). Therefore, neither Officer Bullock's alleged inattentiveness nor the fact that a serious accident resulted create a fact issue as to Officer Bullock's recklessness.

***The combination of these allegations.*** Powell argues that, even if the above acts would be merely negligent in isolation, their combination in one collision raises a fact issue as to recklessness. We take Powell to assert that a set of simultaneous negligent acts may in some circumstances be stacked so as to create a question of recklessness—that is, that being negligent on *multiple* fronts actually constitutes *recklessness*. For purposes of our decision, we will assume without deciding that such a scenario is possible. Even so, the burden of establishing the necessary predicates of negligence was on Powell, the party challenging governmental immunity. *See McKenzie*, 578 S.W.3d at 512. Absent any showing of Bullock's speed or his proximity to Bender, and given that speeding and proximity to others are "part and parcel" of high-speed chases, it is doubtful that Powell even raised a fact issue as to negligence on those points. *See Maspero*, 640 S.W.3d at 532. The only allegation that sounds in traditional negligence—Bullock's inattention—finds similarly slim support in the record, and in any event stands alone. On this thin evidence, even if we were inclined to craft a novel "negligence plus negligence" rule of recklessness, it would not suffice to show recklessness here.

As we did in *Maspero*, we also consider evidence suggesting that Officer Bullock was *not* reckless. *See id.* (discussing evidence showing

that the officer "engaged in some degree of risk assessment" and thus was not reckless); *see also Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018) (explaining that although we take as true all evidence favorable to the plaintiff, "we cannot disregard evidence necessary to show context"). Officer Bullock was expressly assigned to the chase, authorized to pursue it, and stayed in contact with his supervisors throughout it. He also drove with his lights and siren activated during the chase. These actions affirmatively demonstrate Officer Bullock's "intent to minimize potential harm," not his intent to ignore or exacerbate the possible risks posed by a car chase. *Maspero*, 640 S.W.3d at 532. The court of appeals erred in not considering evidence that contextualizes the circumstances and suggests that Officer Bullock was *not* reckless. *See id.* (holding that the officer was not reckless during the chase because, among other things, she stayed in constant communication with her sergeant).

To be clear, as we noted at the outset, the City was not required to affirmatively marshal evidence of Officer Bullock's non-recklessness. It was, and remains, Powell's burden to raise a fact issue. So long as the City did not "challenge the existence of [the] very [] facts" Powell relied on to do so (by alleging that a different entity's employee struck Powell, for instance), it was under no burden to provide evidence, including evidence of Officer Bullock's good behavior. *Garcia*, 372 S.W.3d at 635. Evidence of risk assessment is still relevant to the recklessness inquiry, however, as it undermines Powell's contention that Officer Bullock "did not care about the result" of his action. *Hartman*, 201 S.W.3d at 672 n.19. Officer Bullock's receipt of permission to begin pursuit, his frequent

34

contact with his superiors, as well as his use of lights and siren are all useful evidence supporting the conclusion that he did not act recklessly.

The City then argues that the court of appeals erred in ignoring evidence that Powell did not move out of the way as the officers approached the intersection. We disagree with the City and conclude that the court of appeals correctly disregarded this contention. The Transportation Code provides that when the operator of a vehicle sees an emergency vehicle approaching, the operator must "stop and remain standing until the authorized emergency vehicle has passed." Tex. Transp. Code § 545.156(3).

Powell complied with this law and, based on this record, is without fault. He "stopped at the stop sign" behind the intersection and did not move as the officers approached Brandt Road. To avoid a collision, particularly in light of fast-moving vehicles, it is often better to stay still rather than to try to move *out* of the way, which risks getting *in* the way. Two people walking down a hallway might try to move out of each other's way, only to collide because each has mirrored the other (like-minded) person. From an officer's point of view, it is oftentimes easier to avoid a stationary object than a moving target. Counting Powell's inaction against him, however, would incentivize more moving targets and cause *more* crashes. The court of appeals thus correctly decided not to consider how Powell's actions (or inaction) may have contributed to the crash.

Powell's lack of culpability illustrates the consequences of the law of immunity. The legislature has determined that under circumstances like those before us—where an officer was at most negligent but not reckless—the governmental unit must be immune because the law would

otherwise unduly deter conduct that is necessary to protect the public as a whole. On the other hand, innocent individuals like Powell are left bearing the costs of actions that benefit us all. Any of us might find ourself in Powell's shoes; the very nature of emergency responses is that they are unpredictable. Perhaps the current rules best serve the interests of the State as a whole. Or perhaps some other system allowing recovery—even if only to a highly circumscribed degree—for those without fault who are injured as a result of emergency responses would be better. Such an inquiry and any resulting decision are proper undertakings for the legislature, not this Court.

## IV

The City of Austin's immunity to suit is not waived. Its plea to the jurisdiction should have been granted. We reverse the judgment of the court of appeals and render judgment dismissing the case for lack of jurisdiction.

Evan A. Young
Justice

**OPINION DELIVERED:** December 31, 2024

36